**MID–TEX ELECTRIC COOPERATIVE, et al.**

v.

**FEDERAL ENERGY REGULATORY COMMISSION.**

No. 87–1675.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1988.

Decided Dec. 9, 1988.

Robert A. O'Neil, with whom, Wallace F. Tillman and Michael D. Oldak, Washington, D.C., were on the brief for petitioners.

Samuel Sopper, Atty., F.E.R.C., with whom Catherine A. Cook, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief for respondent. Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent.

Alan J. Statman, Washington, D.C., was on the brief, for intervenor Southwestern Public Service Co.

Albert R. Simonds, Jr., Washington, D.C., was on the brief, for intervenor Montaup Elec. Co.

Before EDWARDS, WILLIAMS and D.H. GINSBURG *, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

This is the third of a series of cases before this court dealing with the Federal Energy Regulatory Commission's proposals to adjust the timing of federally regulated electric utilities' recovery of the cost of capital employed in construction. Before the adoption of the contested rules, a utility normally could recover these costs only after a newly constructed facility became operational. It would accrue the carrying charges on the capital used to finance new construction in a separate account, "Allowance for Funds Used During Construction" ("AFUDC"), which appeared as a non-cash asset on the utility's balance sheet. When the plant went into service, the entire value of the investment, including these accrued financing charges, would be added to the rate base. Only at this point would the utility begin to recover its financing costs from ratepayers.

FERC's current proposal would allow a utility to include up to 50 percent of the costs of "construction work in progress," or "CWIP," in its rate base as it incurred them and thus to start earning a return that typically would offset 50 percent of the associated costs of debt and equity capital. The utility in principle recovers all its costs under either the AFUDC or CWIP method, but CWIP allows a substantial part to be recovered sooner.

A group of wholesale customers of suppliers of electric power have attacked this rule on a variety of grounds, focusing primarily on alleged anticompetitive effects. Although we find that the Commission has not been arbitrary or capricious in its assessment of the potential anticompetitive problems and adoption of solutions, we grant the petition for review because FERC has not supported one aspect of the rule with reasoned decisionmaking. We remand the case to the agency for further consideration of the burden of proof required of a party seeking preliminary relief from an anticompetitive "price squeeze."

\* \* \*

FERC's predecessor, the Federal Power Commission, opened the door to CWIP in 1976 with an order allowing its use under

three exceptional circumstances: to construct pollution control facilities, to convert oil and gas plants to coal, and to remedy severe financial hardship. Order No. 555, 56 FPC 2939, 2943–46 (1976).

Seven years later FERC expanded the availability of CWIP by adopting "a fixed percentage approach that allow[ed] any utility to file to include up to 50 percent of all CWIP in rate base in addition to any CWIP related to fuel conversion or pollution control facilities." Order No. 298, 48 Fed.Reg. 24,323, 24,348 (1983).

The Commission stated three general purposes behind the decision to allow CWIP generally. First, it sought to mitigate a bias against capital investment in needed facilities. It saw this bias as arising from a utility's cost of capital exceeding its allowed rate of return[1] and from cash flow problems. Second, it hoped to improve assessment of the need for facilities by having utilities send price signals more closely reflecting their future costs. Third, the Commission expected to enhance rate stability by mitigating the abrupt price increases that tend to occur under AFUDC. *Id.* at 24,326, 24,329–31.

The present lead petitioner and others challenged Order No. 298 in *Mid–Tex Electric Cooperative, Inc. v. FERC*, 773 F.2d 327 (D.C.Cir.1985) (*"Mid–Tex I"*). They attacked both the basic reasoning of the Commission and its failure, as they viewed it, to address properly certain anticompetitive effects going under the piquant labels "double whammy" and "price squeeze." While this court found that FERC's stated purposes were valid and that the agency had "reasonably concluded that the rule would indeed serve those purposes," *id.* at 362, it nonetheless vacated certain portions of the rule and remanded the case to the Commission for further consideration of the rule's potential anticompetitive effects. *Id.*

Following the remand, FERC adopted an interim rule, Order No. 448, that temporarily restored many of the features of the previous rule. Order No. 448, 51 Fed.Reg. 7774 (1986), *reh'g denied,* 51 Fed.Reg. 22,065 (1986). This court upheld the interim rule in *Mid–Tex Electric Cooperative, Inc. v. FERC,* 822 F.2d 1123 (D.C.Cir.1987) (*"Mid–Tex II"*).

On June 18, 1987, after considering the comments filed in response to the promulgation of the interim order, FERC issued its final rule on CWIP. Order No. 474, 52 Fed.Reg. 23,948 (1987), *clarified by* Order No. 474–A, 52 Fed.Reg. 35,695 (1987). Several wholesale customers of suppliers of electric power, including Mid–Tex Electric Cooperative, Inc. and Golden Spread Electric Cooperative, Inc., electric power generation and transmission cooperatives, and the National Rural Electric Cooperative Association, a national service organization representing 1000 rural electric cooperatives, filed this suit challenging the orders. (We will refer to all the petitioners collectively as "Mid–Tex.") The petitioners allege generally that the orders do not remedy the anticompetitive aspects of CWIP or comply with the directives of *Mid–Tex I.*

### SCOPE OF REVIEW

The Federal Power Act expressly provides that, in the event of judicial review of any order issued by FERC, "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825*l* (b) (1985). This court observed in *Mid–Tex I,* however, that "it is ordinarily true that the ' "substantial evidence" requirement applicable to our review ... demands a quantum of factual support no different from that demanded ... by the arbitrary or capricious standard.' " 773 F.2d at 338 (quoting *Association of Data Processing Serv. Orgs. v. Board of Governors,* 745 F.2d 677, 686 (D.C.Cir.1984), and generalizing the finding that that decision had reached with respect to another substantial evidence provision).

---

**1.** This is simply a variation on the familiar Averch–Johnson effect, which infers a utility bias in favor of capital investments when al-lowed rates exceed the cost of capital. With the reverse relationship between allowed rates and cost of capital, the bias is reversed.

■ In applying this standard, we require that the agency's decision be the product of reasoned decisionmaking that can be ascertained from the record. *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995, *reh'g denied*, 332 U.S. 783, 68 S.Ct. 26, 92 L.Ed. 367 (1947). "As a result, it becomes crucial that the Commission's order include a reasoned opinion detailing those factual elements in the record that underlie the Commission's actions." *Public Systems v. FERC*, 606 F.2d 973, 979 (D.C.Cir.1979) (reviewing an agency decision under the identical review provision of the Natural Gas Act); see also *Central Power & Light Co. v. FERC*, 575 F.2d 937, 939 (D.C.Cir.) (FERC has an "obligation to articulate its reasoning" for agency actions), *cert. denied, Dallas Power & Light Co. v. Central Power & Light Co.*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 652 (1978). So long as its decision is not arbitrary, of course, the basic policy choices are for the Commission.

### THE MERITS

In 1987 FERC reevaluated its original 1983 policy objectives in light of changed circumstances. Although it found the second and third justifications still relevant, it believed that improved financial conditions in the electric utility industry had decreased the bias against new construction. Order No. 474, 52 Fed.Reg. at 23,952. FERC did not totally discount this goal, however, because of the possibility that the industry's financial condition might again deteriorate. *Id.*

After its introductory discussion of these goals, the Commission articulated the reasoning supporting the final CWIP rule and addressed the possible anticompetitive effects. Mid–Tex takes issue with three aspects of the decision: its treatment of "double whammy"; its decision to remedy "price squeeze" on a case-by-case basis; and the burden of proof required of any party seeking interim relief from an alleged price squeeze. (Although petitioners make several other arguments, they are all either relevant to the three aspects identi-

fied above or are rendered irrelevant by FERC's decision to proceed on a case-by-case basis in remedying price squeeze.) We affirm FERC's order in all areas except the last.

*Double Whammy*

■ If a utility's wholesale customer decides to construct facilities to meet all or part of its future needs, CWIP may inflict a "double whammy" on the customer. If the wholesale customer is forced to pay the CWIP portion of the supplier's rate, it will pay not only for its own construction program but also for the cost of a facility from which it will not benefit (or at any rate may not benefit in the same proportion as that for which it has been charged). If the two compete for retail sales, double whammy requires the wholesale customer to pay some of the costs of the power that its supplier will offer to retail customers. Moreover, if the wholesale customer competes for retail sales with other wholesale customers of the supplier, it is further disadvantaged because double whammy causes it effectively to subsidize those competitors. In *Mid–Tex I* this court found that FERC's 1983 consideration of the double whammy effects of the rule was "both inconsistent and inadequate." 773 F.2d at 362.

Order No. 474 attempts to solve the problem of double whammy through "forward looking allocation ratios" that will reduce or eliminate CWIP payments by a wholesale customer that plans to build its own generation facilities. 52 Fed.Reg. at 23,966. The Commission's object is for each customer to pay that share of CWIP that corresponds to its share of the use of the utility's system over the life of each CWIP project. *Id.* at 23,960. The ratio will be based on the wholesale customer's good faith representations about its plans to reduce its future loads.

The Commission realized that such representations might prove inaccurate if circumstances were to change between the time the wholesale customer made its projections and the time the new facility became operational. (Moreover, without a sanction for underestimation, wholesale

customers would have every incentive to underestimate. See Order No. 474-A, 52 Fed.Reg. at 35,701.) Under the rule, a wholesale customer who does not terminate or reduce service as it previously specified will be given two choices:

to either (1) seek to regain its prior status by paying the amount of revenue not paid as CWIP, with interest, plus reimbursement of any system costs due to inefficiencies caused by the utility not having been able to plan to provide it with service ..., or (2) pay rates that reflect the additional costs incurred by the utility to continue service.

Order No. 474, 52 Fed.Reg. at 23,961. When the customer makes payments to "regain its prior status," the order allocates the benefit of these payments to the other customers, whose prior CWIP payments will have been inflated as a result of the misestimates, so as to hold them "harmless from the procurement decisions of the prodigal customer." *Id.*

Mid-Tex takes issue with an observation that the Commission made in its disposition of the double whammy issue. Referring to wholesale customers' possible efforts to meet their needs through joint ventures with their suppliers, the Commission said that the "final rule [is] neutral in its effect on wholesale customers' ability to enter into joint ventures with utilities." Order No. 474-A, 52 Fed.Reg. at 35,696. Petitioners contend that in fact CWIP reduces utilities' incentives to proceed by way of joint ventures by reducing the risks and costs of capital investment compared to those risks and costs under AFUDC. Joint ventures, they suggest, are to be preferred because they disperse ownership of the facilities. The Commission, they argue, could have offset the diminished incentive for joint ventures by conditioning utilities' access to CWIP on their having first offered their customers a chance to participate as joint owners of the projects. Initial Brief of Petitioners ("Petitioners' Brief") 37-38; Request for Rehearing, Joint Appendix ("J.A.") 842-44.

We cannot gainsay petitioners' point that permission to include up to 50 percent of CWIP in the rate base diminishes the financial incentives for suppliers to engage in joint ventures, compared to what they would be under AFUDC. To this extent, the Commission's assertion that the CWIP rule is "neutral" appears to be in error. But in their request for rehearing, petitioners placed this point in the midst of a general claim captioned, "THE COMMISSION DOES NOT HAVE UNFETTERED DISCRETION TO IGNORE AT THE RULEMAKING STAGE THE POTENTIAL ANTICOMPETITIVE EFFECTS OF ITS RULEMAKINGS." J.A. at 841. In fact the Commission had addressed at enormous length both the price squeeze and double whammy effects—the anticompetitive effects that had been the focus of this prolonged sequence of rulemaking and litigation. As to double whammy, it had produced a solution with which Mid-Tex found little fault. *Id.* at 866-70. Thus petitioners, in the midst of a broadside and largely implausible attack on the Commission, evidently sought both to raise a new anticompetitive effect only marginally related to double whammy and to critique one sentence of doubtful importance in the Commission's consideration of that issue. We do not think that the Commission can be faulted for failing to respond.

Moreover, the Commission accurately observed in its consideration of double whammy that wholesale customers who do enter into joint projects would not be penalized because of the forward looking allocation ratios. Order No. 474, 52 Fed.Reg. at 23,-961. This argument explicitly and (as we see it) correctly addressed the exact interaction between the joint venture alternative and the double whammy issue proper. On balance then, Mid-Tex's concern does not convince us to reject an otherwise supported and reasonable approach to the problem of double whammy, or to require the Commission to reconsider an independent claim as to the effect of CWIP on joint ventures regardless of its cure of double whammy.

In a second concern, the wholesale customers argue that FERC has not adequately defined a supplier's obligation to provide service to customers that eliminated or re-

duced their dependence on the supplier and wish to resume that service. The Commission discussed this issue at length but rather inconclusively in Order No. 474–A. 52 Fed.Reg. at 35,700–01. In their brief, petitioners take a somewhat different tack, suggesting that the need for their joint venture proposal is especially acute, "given the Commission's comments in Order No. 474, that a supplier can terminate service to a customer, notwithstanding these forced CWIP payments, if an alternate source of supply for the customer exists[.]" Petitioners' Brief at 38 (footnote omitted). Nothing the Commission said in Order No. 474–A supports the imputation of this view to the Commission. While it observed that "[i]f there are *sufficient* alternative sources, the Commission is unlikely to order continued service," 52 Fed.Reg. at 35,-701 (emphasis added), it went on to say:

> However, the Commission does not believe that, based on the presence of one alternative, regardless of the quality, re-liability, or cost of that alternative, the Commission can automatically conclude that termination of service to a given customer will always be in the public interest. The Commission believes that such determinations must be made on a case-specific basis.

*Id.* As the CWIP rule does not in fact expose petitioners to the jeopardy they assert, this contention is no basis for judicial intervention.

*Price Squeeze*

"Price squeeze" arises from the relationship between the supplier, the wholesale customer and the retail customer. The supplier sells electric power to both wholesale and retail customers. The former transactions are regulated by federal regulators; the latter by state ones. The wholesale customers in turn sell power to their retail customers. These transactions are regulated by state regulators. The relationships can be rendered graphically:

A price squeeze occurs when a supplier charges its wholesale customers a higher rate, in relation to costs, than it charges its retail customers. Order No. 474, 52 Fed. Reg. at 23,948 n. 4. Such a rate differential makes it harder for the wholesale customer to compete with the supplier for retail customers.

The federal provision for CWIP may cause a price squeeze where state regulations do not allow the supplier to include as much CWIP in the rates it charges retail customers as federal regulation allows it to charge its wholesale ones. While the wholesale customer will be legally free to pass on the CWIP that it is charged for its supply, to do so will put it at a severe disadvantage in competition for sales to retail customers.

In 1983 FERC's position with regard to price squeeze was highly inconsistent. The agency professed a willingness to assess and mitigate price squeeze on a case-by-case basis, while simultaneously adhering to its "stated policy not to remedy a price squeeze if it is due solely to state regulatory action or inaction." Order No. 298, 48 Fed.Reg. at 24,346 n. 97. The *Mid–Tex I* court instructed the Commission either to determine that the CWIP rule would have

no significant anticompetitive effects or to explain why it could consider price squeeze on a case-by-case basis. 773 F.2d at 362. If FERC could not satisfy one of those directives, then the court required it to reconsider a series of premises on which Order No. 298 was based. *Id.*

On remand, FERC decided to comply with the second *Mid–Tex I* option, thereby avoiding reconsideration of the lengthy list of questioned premises. In choosing this course, the agency reversed its previous policy of refusing to remedy regulatory price squeeze. After an extensive analysis of case law on the issue of price squeeze, Order No. 474, 52 Fed.Reg. at 23,952–57, it concluded that "it is obliged to take account—in both rulemaking and setting rates within the zone of reasonableness—of a price squeeze created solely by a disparity between the ratemaking policies of State regulatory agencies and the Commission." *Id.* at 23,956.

■ With the decision to address regulatory price squeeze made, the Commission then determined the procedure through which it would remedy the effect. FERC's rationale for choosing a case-by-case method was stated as follows:

> The comments received, as well as the Commission's own experience in addressing price squeeze allegations, support a conclusion that the Commission should examine the potential price squeeze effects of the CWIP rule on a case-by-case basis. As several commenters point out, the various states treat CWIP differently.... There are wide variations in treatment of numerous ratemaking issues (*e.g.*, return on equity allowances; historic v. future test periods; and average v. year-end rate base investment allowances) which affect the rate (and thus price squeeze effect) of any state/Federal CWIP policy similarities or differences. Consequently, the Commission maintains that it would be a futile exercise to track state CWIP policies without regard to these other interrelated cost-of-service policy differences that can only be examined on a case-by-case basis.

\* \* \* \* \* \*

Based on its experience with filings made under Order No. 298, the Commission concludes that it is not possible to say that the CWIP rule will have a generic price squeeze effect; especially in view of the fact that most states allow at least some CWIP in rate base. Rather, any potential price squeezes would occur as the CWIP rule is applied within the context of individual rate filings.

*Id.* at 23,953, 23,954.

The record supports the Commission's observation concerning the different treatments of CWIP at the state level. A chart prepared by Salomon Brothers and submitted to FERC by the petitioners as part of their comments on Order No. 448 indicates the diversity of state regulatory approaches to CWIP. J.A. at 601–09. State responses range from an absolute prohibition of CWIP (California, Hawaii, Indiana, Iowa, Massachusetts, Montana, Missouri, New Hampshire, Oregon, Rhode Island, South Dakota and Washington) to an allowance of some CWIP (Colorado, Florida, Louisiana, Maryland, Nevada, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oklahoma, South Carolina, Utah, West Virginia, Wisconsin, Vermont and Virginia) to more complicated schemes (for example, Kansas allows CWIP "only if project commenced and completed within 1 year"). *Id.* The report concluded that 31 states made some allowance for CWIP in the rate base. Order No. 474–A, 52 Fed. Reg. at 35,699 n. 27.

Just as they did in their comments submitted to FERC, petitioners here recognize the range of state rules governing inclusion of CWIP in the rate base. They summarize the approaches as follows:

> Two states allow pollution control; [o]ne state allows CWIP "short term projects"; [o]ne state allows CWIP on projects completed when rates are effective; [o]ne state allows CWIP on projects commenced and completed in one year; [o]ne state allows CWIP on projects 75% complete; [o]ne state permits CWIP for financial integrity; [o]ne state permits CWIP on projects in service at the time of hearing; [o]ne state allows 70%

CWIP; [and] [o]ne state allows CWIP for emergencies.

Petitioners' Brief at 31 (quoting from Order No. 474–A and comparing these approaches to federal regulations). In view of the lack of uniformity among the approaches taken by the various states, the Commission's decision to proceed on a case-by-case basis seems eminently reasonable. Because we find that the varied range of state practices is ample justification for FERC's decision, we do not need to analyze the accuracy or reasonableness of the additional justifications offered in Order No. 474–A. 52 Fed.Reg. at 35,699.

The remedy applied on a case-specific basis to solve any problems of price squeeze caused by the inclusion of 50 percent CWIP may take one of two forms. The Commission may reduce the return on equity to the lower end of the zone of reasonableness, or exclude part or all of the non-pollution control/fuel conversion CWIP from the rate base so as to eliminate the price squeeze. Order No. 474, 52 Fed. Reg. at 23,957. Petitioners claim that this remedy is an impermissibly narrow one because it does not address price squeeze caused by the inclusion of pollution control or fuel conversion CWIP. Petitioners' Brief at 44.

Rather than finding FERC's remedy to be impermissibly narrow, we find that Mid-Tex's focus on Orders Nos. 474 and 474–A is misleadingly narrow. The remedial provisions of the orders simply do not deal with price squeeze caused by pollution control or fuel conversion CWIP. But the agency has the statutory authority to alleviate any irreparable injury arising from any sort of price squeeze and has indicated readiness to act on price squeeze at the suspension phase under circumstances that it believes are appropriate. See *West Texas Utils. Co.*, 18 FERC ¶ 61,189, at 61,376 n. 10 (barring "extraordinary circumstances" agency will not consider *unproved* price squeeze allegations at suspension stage).

Accordingly, we reject Mid-Tex's argument that such a price squeeze would be unremedied. We note that our rejection is of the abstract argument; when we are faced with actual cases in the future, we certainly would consider allegations that FERC failed to address issues of anticompetitive price squeeze caused or aggravated by the inclusion of pollution control or fuel conversion CWIP in the rate base.

Mid–Tex launches a slightly different attack on FERC's decision to proceed on a case-specific basis when it criticizes the agency for inadequately explaining why the federal CWIP rule should not simply track state CWIP policies. Petitioners' Brief at 35–36. FERC stated that it rejected such an approach because that "could well result in an abandonment of the Commission's authority to set ratemaking policy and transfer such authority to the individual states." Order No. 474, 52 Fed.Reg. at 23,956. In *Mid–Tex I* the court made clear that "except to the extent that avoidance of anticompetitive effects is itself an element of federal policy," 773 F.2d at 361, this intent to avoid abdication was a "compelling" reason for rejecting the tracking proposal, *id.* As the Commission's double whammy solution and new policy on regulatory price squeeze largely satisfy *Mid–Tex I*'s requirements for the avoidance of anticompetitive effects (we come shortly to the exception), its rejection of tracking is indeed compelling.

*The Burden of Proof Required of a Wholesale Customer Seeking Preliminary Relief from an Alleged Price Squeeze*

■ FERC's provision authorizing preliminary relief for a party alleging that the inclusion of CWIP in the rate base would cause price squeeze, § 35.26(g)(2), reads as follows:

(2) *Preliminary relief.* If an intervenor in its initial pleading alleges that a price squeeze will occur as a direct result of the public utility's request for CWIP pursuant to § 35.26(c)(3) of this part [allowing non-pollution control and non-fuel conversion CWIP] and makes a concrete, substantial showing that it is likely to incur imminent, irreparable harm if such CWIP is allowed, the Commission will consider preliminary relief at the suspen-

sion stage of the case pursuant to paragraph (g)(4) of this section [providing for price squeeze remedies]. Whether or not preliminary relief is granted at the suspension stage will not preclude consideration of further remedies later in the proceedings, if warranted.

Order No. 474–A, 52 Fed.Reg. at 35,702.

Mid–Tex alleges that the standard chosen for preliminary relief in the form of suspension—a concrete, substantial showing of a likelihood of suffering imminent, irreparable harm—is unduly stringent. Although we do not decide that the standard is impermissible, we are not satisfied that FERC's adoption of this burden of proof is the product of reasoned decisionmaking.

FERC's justification of its decision seems to rest on two arguments. First, it states that under the CWIP rule, "one form of iterim [sic] relief at the Commission's disposal is suspension of the entire rate increase for up to five months. Such action regarding the portion of the rate increase not based on CWIP would constitute a permanent loss of revenues to the utility." *Id.* at 35,698. If the Commission suspended an *entire* rate increase in the interest of giving preliminary protection against the effects of CWIP, including portions of the increase unrelated to CWIP, then certainly the loss would be permanent. For rate components other than CWIP, the utility typically cannot recover revenue lost in a suspension period. But this rationale overlooks the Commission's authority to suspend *less* than the entire rate increase. See Order No. 474, 52 Fed.Reg. at 23,966 (CWIP rule, 18 C.F.R. § 35.26(g)(4)(i), allows the agency to suspend "the entire rate increase or all or a portion of the non-pollution control/fuel conversion CWIP component for up to five months"). If FERC suspended only the CWIP component, suspension would only defer the utility's collection of the revenue, for costs denied as CWIP could be recovered later under AFUDC, as the Commission recognized. Order No. 474–A, 52 Fed.Reg. at 35,698. Thus the Commission's first rationale fails because it could exercise its suspension power only as to CWIP (or a portion of

that), and subject the utility to no permanent loss.

Second, the agency justifies its choice of the imminent, irreparable harm standard by observing that this is the standard for preliminary relief in all of its suspension decisions. Brief for Respondent Federal Energy Regulatory Commission 36 (citing Order No. 448, 51 Fed.Reg. at 7778). But this argument ignores the special character of suspension of a CWIP-related increase. As we have just explained, its suspension does not involve permanent loss but only deferral (with interest).

A wholesale customer whose competitiveness is reduced because of a CWIP-induced price squeeze, however, may be permanently harmed if it cannot receive preliminary relief. In formulating the standard for interim relief, FERC must consider the severity of this anticompetitive injury and balance it against any injury suppliers would suffer. Based on the record before us, the only harm threatening suppliers is a delay in recouping financing charges; thus, the balance seems to favor a less stringent standard that FERC normally applies.

Our holding today does not preclude the Commission from adopting a burden of proof that requires a party seeking preliminary relief to make a concrete, substantial showing that imminent, irreparable harm is likely. Given a more developed and reasoned explanation, the balance between the harm suffered by the supplier and that suffered by wholesale customers may favor the traditional, stringent standard. But in this context, with the difference developed so starkly between suspension of CWIP and that of any other rate component, FERC's simple reliance on the customary nature of its standard is not enough.

\* \* \*

We find ample support in the record for the vast majority of the new CWIP rule. The decisions regarding the anticompetitive problem of double whammy and the case-by-case approach to remedying price squeeze are the products of reasoned decisionmaking. Nonetheless, we must remand the CWIP rule to the agency so that

FERC can consider further the appropriate standard for preliminary relief. Accordingly, the petition for review is hereby
*Granted.*